JULIET M. MYERS, Appellant, *v.* THE COMMERCIAL TRAVELERS' MUTUAL ACCIDENT ASSOCIATION OF AMERICA, Respondent.

*Life insurance policy — admission of evidence as to a witness' statement.*

Upon the trial of an action, brought to recover on a life insurance policy issued by a mutual accident association, one of the plaintiff's witnesses was asked on cross-examination whether he had stated to a certain person that he had talked with a son of the plaintiff, and that he (the witness) did not think they had any claim against the defendant. The answer of the witness, received over the plaintiff's objection and exception, was, " I don't remember that; I wouldn't take my oath that I didn't, but I have absolutely no recollection of it."

The witness had no interest in the controversy, and it had not then been made to appear, nor was it afterwards, that he had any right to speak for or represent the plaintiff.

*Held*, that what such witness thought or said of the general merits of the claim was neither competent nor relevant;

That, as it could not be said that the error did not result in harm, it could not be disregarded, and necessitated the reversal of the judgment rendered in favor of the defendant.

APPEAL by the plaintiff, Juliet M. Myers, from a judgment of the Supreme Court in favor of the defendant, entered in the office of the clerk of the county of New York on the 11th day of September, 1894, upon the verdict of a jury rendered after a trial at the New York Circuit dismissing the plaintiff's complaint upon the merits, and also from an order made on the 15th day of June, 1894, and entered in said clerk's office denying the plaintiff's motion for a new trial made upon the minutes.

*Wm. B. Hurd, Jr.*, for the appellant.

*M. W. Van Auken*, for the respondent.

PARKER, J. :

Defendant in November, 1889, issued to Egbert G. Myers a certificate of membership, by which, among other things, it agreed that in the event of his death by external, violent or accidental means, it would pay to this plaintiff the sum represented by the payment of two dollars by each member of the association ; but in no event to exceed the sum of $5,000. On the evening of July 26, 1892, Mr. Myers was found dead, submerged in nine feet of water, in the

swimming bath of J. A. Payne, at 214 South Broad street, Philadelphia. The deceased had gone to Philadelphia from New York that morning, and was apparently in robust health. The bath was a pool thirty feet wide by one hundred feet long; the sides and bottom were of stone and cement; the water was from three to nine feet deep, and there were spring boards and ladders from which swimmers could jump and dive, and ropes were fastened on the sides at a distance of three feet from each other to which swimmers might cling for rest. A few minutes before eight o'clock on that evening Myers entered the bath house, and at a quarter before nine he was found dead at the bottom of the pool. There were fifty or sixty persons in the water with him, which was at blood heat.

Plaintiff's theory of the case was that the insured, while swimming, dived in the water and struck some hard substance at the side or bottom of the pool, with his head, rendering him unconscious, during which time he drowned. On the other hand, defendant endeavored to establish that the insured had heart disease, and that his heart ceased to act while he was supporting himself by the rope, suspended above the water, where he was last seen alive.

Plaintiff, in support of her theory, produced laymen who testified that his health had always seemed to be good; that he was but twenty-three years of age; had not had since childhood any sickness except trifling stomach or throat troubles; his weight was 140 pounds; he was five feet eight inches in height; was a rosy cheeked, ruddy complexioned man, and always had been fond of and was active in athletic sports, which, with him, included base ball, lawn tennis, boating and swimming.

She called two physicians, one of whom had doctored him for tonsilitis about a month before his death. He testified that on that occasion he examined his heart and found it apparently normal, with no indication of organic disease. Eight days before his death he was accepted as a first-class risk by the Massachusetts Life Insurance Company, an examination being made by Dr. William Gray Vermilye, examiner-in-chief of the company. The result being that he passed the deceased as a man of more than ordinary good health, with a pulse of seventy, soft and regular, who had no heart murmurs, and in whom there was no indications of heart disease, and whose urine was normal.

Against this evidence the defendant presented the testimony of Dr. Sidebotham, who made the autopsy upon deceased. He testified that there was no water in the stomach, none in the lungs; that the left ventricle of the heart was hypertrophied; the walls of the heart soft, aortic opening admitting not quite two fingers, and valve thickened. That he discovered nothing to indicate that cause of death was drowning, and gave it as his opinion that death was caused by hypertrophy of the heart, with an aortic stenosis.

Plaintiff further introduced testimony tending to show that a short time prior to his entering the water there was no lump or abrasion on his forehead or temple, but when his body was taken from the water there was a lump or abrasion. Whether there was a lump on his forehead when he was discovered at the bottom of the pool was regarded by both parties as an important circumstance in view of the character of the evidence to which we have adverted.

Defendant's counsel conducted his side of the case throughout the trial on the theory that there was no such injury discovered. The plaintiff called Joseph C. Leggett, who testified that he had known the dead man for twelve or fourteen years, and was his friend; that after his death he saw him first at an undertaking establishment on Eighth avenue, and that there was then "an abrasion on his head, on the temple." On cross-examination the witness said he didn't know Dr. Lyon, to his knowledge, but that he had been called upon within a few days after the death by a gentleman who made inquiries of him touching the death of Myers.

Then this question was put: " Q. Did you tell Dr. Lyon in one of these interviews that you had a talk with J. Weston Myers the night before, and that you did not think they had any claim against this defendant company? [Objected to as incompetent and irrelevant. Objection overruled. Plaintiff excepts.] A. I don't remember that. I wouldn't take my oath that I didn't, but I have absolutely no recollection of it."

The witness had no interest in the controversy; it had not then been made to appear, nor was it afterwards, that he had any right to speak for or represent this plaintiff, and clearly what witness thought or said of the general merits of the claim was neither competent nor relevant.

The defendant's brief asserts, as the best answer to be made to

an attack upon this ruling, that "it was competent for defendant to show any admission made by plaintiff or by her son or the witness Leggett if followed by evidence connecting her with it; such testimony was also relevant. The witness' answer, however, rendered evidence as to plaintiff's connection with such admission unnecessary." It will be observed that this answer concedes the incompetency of the evidence at the time it was admitted, but says in effect that he could have cured the error if the answer of the witness had been such as to have made it necessary.

In other words he says, if the witness had answered yes, it would have been necessary for me to have shown plaintiff's connection with the witness. But, as the answer was of no consequence, it was not necessary for me to do so. We do not agree with him as to the effect of the answer, but think it may have been almost as damaging as though the answer had been in the affirmative.

The reply "I don't remember that. I would not take my oath that I didn't, but I have absolutely no recollection of it," may not unlikely have persuaded some members of the jury that he had made such a statement to Dr. Lyon, and that such was the fact.

Certainly its tendency must have been to raise a doubt in the minds of some of the jury whether he did not say it, and even that doubt may have had an important bearing in the disposition made by them of the issues submitted.

As we cannot say that this error did not result in harm, it cannot be disregarded.

The judgment should be reversed, with costs to the appellant to abide the event.

VAN BRUNT, P. J., and O'BRIEN, J., concurred.

Judgment reversed, new trial ordered, costs to appellant to abide event.